**2020 UT App 123**

## THE UTAH COURT OF APPEALS

HITORQ LLC AND LISA PASQUARELLO,
Appellants,
*v.*
TCC VETERINARY SERVICES INC., TYLER S. STIENS, ARTZ VETMED
SERVICES PLLC, AND JOHN ARTZ,
Appellees.

Opinion
No. 20180971-CA
Filed August 20, 2020

Third District Court, Silver Summit Department
The Honorable Kara L. Pettit
The Honorable Kent R. Holmberg
No. 160500473

Stephen K. Christiansen and Sam Meziani, Attorneys
for Appellants

Joseph E. Wrona, Jared C. Bowman, and Steven
Drew Parkinson, Attorneys for Appellees

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES
GREGORY K. ORME and RYAN M. HARRIS concurred.

POHLMAN, Judge:

¶1      HITORQ LLC and Lisa Pasquarello (collectively,
Plaintiffs) appeal the district court's order compelling them to
arbitrate their claims against Tyler S. Stiens, TCC Veterinary
Services Inc., John Artz, and Artz Vetmed Services PLLC
(collectively, Defendants). They also appeal the district court's
refusal to stay the arbitration proceedings. We affirm.

BACKGROUND

¶2    Pasquarello, Artz, and Stiens are all veterinarians who practiced veterinary medicine together in Park City, Utah. Beginning in 2011, they practiced at the Silver Creek Animal Clinic (the Clinic), which was a limited liability company that operated in a building owned by the Silver Creek Animal Clinic Real Estate LLC (the Real Estate Company), another limited liability company. Each veterinarian owns an individual corporate entity, each of which, in turn, has an interest in both the Clinic and the Real Estate Company (collectively, the Companies). Specifically, Pasquarello is the sole member of HITORQ LLC (HITORQ), which has a 25% membership interest in the Companies. Artz is the sole member of Artz Vetmed Services PLLC (Vetmed), which also has a 25% membership interest in the Companies. And Stiens is the sole owner of TCC Veterinary Services Inc. (TCC), which has a 50% membership interest in the Companies.

¶3    In September 2015, Artz agreed to purchase HITORQ's membership interest in the Companies for a cash payment and the assumption of remaining debt. The closing date for the sale was scheduled for November 14, 2015—not long before Pasquarello's planned move out of state—and Pasquarello intended to continue working at the Clinic until the sale closed. But the sale did not close, and Pasquarello alleged that Artz and Stiens refused to allow her to work at the Clinic after November 13, 2015. It is undisputed that in June 2016, Artz and Stiens voted to expel HITORQ from its membership in the Companies on the basis that Pasquarello had failed to be reasonably productive in the practice of veterinary medicine with the Clinic.

¶4    In November 2016, Plaintiffs filed suit against Defendants. Notably, Plaintiffs attached the Clinic's operating agreement (the Operating Agreement) to the complaint. The complaint alleged ten causes of action, but we describe and discuss only the three that are relevant to this appeal.

¶5    Plaintiffs' first cause of action was for breach of contract against Artz and Vetmed (the Contract Claim). As part of the Contract Claim, Plaintiffs alleged that the Operating Agreement required that memberships in the Clinic and the Real Estate Company be sold together.[1] Plaintiffs alleged that the terms of Artz's agreement to purchase HITORQ's membership interest in the Companies included his promises to, among other things, pay a sum to Pasquarello, assume HITORQ's debt related to its purchase of the membership in the Real Estate Company, "pay HITORQ its share of the profits and losses as well as the accounts receivable through the closing date, [and] continue thereafter to pay HITORQ its share of accounts receivable until they were paid in full." Also as part of the Contract Claim, Plaintiffs alleged that Artz prepared a written agreement that did not comport with the purchase agreement in that it failed to include provisions for, among other things, "the sale of the Real Estate membership" and "the payment of accounts receivable."

¶6    According to Plaintiffs, Artz and Vetmed breached the purchase agreement in a number of ways, including "[f]ailing to purchase the membership interests," failing to make the cash payment, failing to "pay HITORQ profits and accounts receivable by November 14, 2015," and "[p]reventing Pasquarello from working after November 13, 2015."

---

1. The Operating Agreement states, "In the case of any voluntary or mandatory buy-out of a Member's interest in the [Clinic], the Members agree that the purchasing Members shall also acquire the selling Member's ownership interest in [the Real Estate Company] on the same terms and conditions as set forth herein. In addition, the selling Member shall pay directly or by setoff all fees and reasonable expenses incurred by the [Clinic] or Members to effectuate the transfer(s)."

¶7     In their second cause of action, Plaintiffs sought damages from Artz and Vetmed for breaching the "duty of good faith and fair dealing" (the Good Faith Claim). As part of the Good Faith Claim, Plaintiffs alleged that under the Operating Agreement, the Clinic's members were paid monthly distributions (Clinic Debt Payments), which they used to "pay their respective debts for the purchase of their Clinic membership interests," and that since December 2015, Artz and Vetmed took Plaintiffs' Clinic Debt Payments for their own use, which left Plaintiffs unable to meet their own financial obligations. Also, as part of the Good Faith Claim, Plaintiffs alleged that Artz did not obtain the financing for the sale despite telling Pasquarello that he had obtained sufficient financing, and that Artz demanded modifications to the purchase agreement well into 2016, saying there were other "large subjects to address before moving deeper into the contract." According to Plaintiffs, Artz and Vetmed breached the duty of good faith and fair dealing by, among other things, "[w]rongfully taking HITORQ's Clinic Debt Payments while failing to close" the sale, making false representations about financing, failing to meet the obligations under the purchase agreement, demanding modifications to the purchase agreement, and voting to expel HITORQ as a member of the Clinic.

¶8     The eighth cause of action sought dissolution of the Companies (the Dissolution Claim). As part of that claim, Plaintiffs alleged that Defendants denied them "the rights and benefits in both entities, changed the character, profits and losses of the Clinic[,] and devalued . . . Plaintiffs' membership." Plaintiffs further alleged that Defendants acted "in a manner that is illegal, oppressive, and directly harmful to Plaintiffs" and that therefore good cause existed for judicial supervision of the winding up of the Companies.

¶9     TCC and Vetmed, both members of the Clinic, filed a notice of their election to purchase HITORQ's interest in the

Clinic in lieu of the Clinic's dissolution. In the notice, TCC and Vetmed reserved their right under the Operating Agreement to mediate and arbitrate.

¶10    Defendants moved to compel arbitration in accordance with the arbitration provision of the Operating Agreement. That provision states,

> Any Member involved in a dispute regarding the enforcement or interpretation of this Agreement may elect to have such dispute referred to non-binding mediation or binding arbitration. In the alternative, all Members involved in such a dispute may elect to have their dispute heard by a court of competent jurisdiction in the State of Utah.

According to Defendants, this provision was triggered because HITORQ, Vetmed, and TCC were all members of the Clinic and thus "agreed to put any disputes 'regarding the enforcement or interpretation of this Agreement' to an arbitrator." Defendants pointed out that the Contract Claim "ma[de] reference to" the Operating Agreement's term that "the real estate membership [must] be sold with the clinic membership" and alleged breach based on the proposed written agreement's failure to contain a term for the sale of the real estate membership; that the Good Faith Claim referred to the Operating Agreement's terms regarding the Clinic Debt Payments and alleged breach based on Defendants' failure to deliver those payments to Plaintiffs and Defendants' vote to expel Plaintiffs from the Clinic; and the Dissolution Claim asked for judicial dissolution, which is "a remedy from within the Clinic Operating Agreement."[2] Hence,

---

2. Defendants cited the Operating Agreement's provision stating that the Clinic "will be dissolved and its affairs must be wound up only upon the written consent of the Members, when the

(continued…)

Defendants asserted that all Plaintiffs' claims "deal with the enforcement or interpretation of the Clinic's Operating Agreement" and "are subject to this arbitration provision."

¶11 Plaintiffs opposed Defendants' motion to compel arbitration, arguing that because their causes of action did "not seek to enforce a provision of the Operating Agreement and [did] not require an interpretation" of it, they were not subject to its arbitration provision. Concerning the Contract Claim, Plaintiffs argued that the claim was based on Defendants' breach of the purchase agreement, not the Operating Agreement, and that the complaint's references to the Operating Agreement were "only to explain why it may have been important to . . . sell both [the Clinic and Real Estate Company] memberships simultaneously." Similarly, Plaintiffs maintained that the Good Faith Claim did not allege a breach of the Operating Agreement and asserted that the "fact that the Operating Agreement may or may not have given the parties the authority to make [Clinic Debt Payments] has no bearing upon whether [Artz and Vetmed's] breach of the contract to purchase and the resulting fallout support a covenant of good faith." And as for the Dissolution Claim, Plaintiffs asserted that instead of being based on Defendants' breach of the Operating Agreement, the Dissolution Claim was based on the fact that Defendants "have acted and are acting in an oppressive manner that has [been] and is directly harmful to [Plaintiffs], or are acting in a fraudulent manner." Thus, Plaintiffs asserted, "statutory grounds" existed for dissolution and "judicial dissolution has nothing to do with the interpretation or enforcement of an operating agreement."

---

(…continued)
[Clinic] has no existing Members or upon entry of a decree of judicial dissolution."

¶12 Defendants responded that although the Contract Claim alleged a violation of the purchase agreement, "the key areas of dispute" still fell within the arbitration provision. For example, although Plaintiffs alleged that the failure to sell both the Clinic and Real Estate Company memberships was "a violation of the purchase agreement," it was the Operating Agreement that required those memberships to be sold together. Likewise, Defendants highlighted that while Plaintiffs alleged that the failure to pay profits and accounts receivable was "a violation of the purchase agreement," the Operating Agreement "governs profits and distributions." Regarding the Good Faith Claim, Defendants maintained that determining whether "Plaintiffs were entitled to receive the Clinic Debt Payments or any other distributions has to be answered by interpreting the Operating Agreement." As to the Dissolution Claim, Defendants asserted that "[w]hether [they] acted as [Plaintiffs] alleged"—denying Plaintiffs the "rights and benefits" in the Companies, changing the profits and losses of the Clinic, and devaluing Plaintiffs' membership—"requires an interpretation of the Operating Agreement because [it] addresses those issues."

¶13 The district court heard oral argument on Defendants' motion to compel arbitration. In its ruling, the court first noted that it was undisputed that an agreement to arbitrate was in the Operating Agreement, to which HITORQ, Vetmed, and TCC were members. The court also observed that it was required "to liberally interpret the arbitration clause and construe it in favor of arbitration." Applying the scope of that arbitration clause to the claims in Plaintiffs' complaint, the court ruled that "there is a dispute involving the enforcement and interpretation of the Operating Agreement" and that the three claims at issue therefore "are subject to the arbitration provision."[3]

---

3. With respect to the other claims in Plaintiffs' complaint, the district court ruled that only one claim (fraud) was not subject to

(continued…)

¶14 Specifically, the Contract Claim and the Good Faith Claim involve a dispute over enforcement or interpretation of the Operating Agreement in reference to "whether or not the real estate membership is supposed to be sold together"—even though "there's a dispute as to whether or not that's even implicated or whether that is in the complaint." The court also determined that those claims involve enforcement or interpretation of the Operating Agreement's provisions regarding "if the selling member is to pay the expenses related to the sale and transfer of her interest" and regarding if the Clinic would pay profits and accounts receivable. In so ruling, the court noted that it was not necessarily agreeing with Defendants' interpretation of the complaint. As for the Dissolution Claim, the court determined that the premise that Defendants denied Plaintiffs "the right and benefits of membership under the Operating Agreement" was "dependent on . . . [the] enforcement or interpretation of the [Operating Agreement] to get to whether or not there should be dissolution." As a result, the court concluded that the Dissolution Claim "is a claim in dispute regarding enforcement or interpretation" of the Operating Agreement and "is subject to the arbitration [provision]." Thereafter, the court appointed an arbitrator.

¶15 In September 2017, as the arbitration process was ongoing, Plaintiffs filed a motion in district court to stay the arbitration proceedings. In the motion, Plaintiffs asserted that Defendants' election to purchase, *supra* ¶ 9, was irrevocable and meant that Defendants were statutorily required to purchase HITORQ's membership interest in the Clinic. Plaintiffs asked the court to stay the arbitration proceedings, determine the fair market value of HITORQ's membership interest, and enter an

---

(…continued)
the arbitration provision. That claim is not at issue on appeal. *Supra* ¶ 4.

order directing the purchase. *See generally* Utah Code Ann. § 48-3a-702(7)–(9) (LexisNexis 2015) (explaining that after an election to purchase has been filed and "upon application of any party, the district court shall stay the proceedings . . . and determine the fair market value of the applicant member's interest in the limited liability company as of the day before the date on which the petition" to dissolve was filed).

¶16   Defendants opposed the motion. They argued that once the district court issued the order compelling arbitration, all issues "related to or arising out of" the Dissolution Claim became subject to arbitration. Defendants also contended that Plaintiffs had already raised and lost the statutory election issue before the arbitrator and that the motion to stay was an attempt to "relitigate" the issue. Plaintiffs disputed that they had received an unfavorable ruling on the issue from the arbitrator.

¶17   In response, Plaintiffs insisted that the district court did not order the election-to-purchase issue into arbitration. They also argued that the statutory remedy was "outside the scope of the Operating Agreement."

¶18   After a hearing, the district court denied Plaintiffs' motion. It explained that the notice of election to purchase was filed in response to the Dissolution Claim and that because it had compelled that cause of action into arbitration, "anything related" to the Dissolution Claim, including the election-to-purchase issue, was also compelled into arbitration. In this respect, the court declined to "carve out" the election-to-purchase issue from its order compelling arbitration, reasoning that such a result would lead to "two courts adjudicating the Dissolution Claim."

¶19   The parties proceeded through the arbitration process, which resulted in the arbitrator issuing a decision. In his decision, the arbitrator granted judgment in favor of Defendants

on the Contract Claim and the Good Faith Claim. With respect to the Dissolution Claim, the arbitrator decided that "dissolution [was] not a viable remedy." Yet the arbitrator decided that in lieu of dissolution, Plaintiffs would sell their interest in the Companies to Artz, both Artz and Stiens, or, alternatively, a third party. The arbitrator also weighed evidence and valued Plaintiffs' interest in the Companies.

¶20 Plaintiffs thereafter moved the district court to vacate the arbitration award on the ground that the arbitrator "exceeded his authority in deciding issues beyond the scope of the parties' arbitration agreement." In essence, Plaintiffs' motion to vacate raised the same arguments they had made in moving to stay the arbitration proceedings and in opposing Defendants' motion to compel arbitration. After a hearing, the court again rejected Plaintiffs' arguments and denied their motion to vacate the arbitration award.

¶21 Finally, Defendants moved to confirm the arbitration award. The district court granted the motion and confirmed the arbitrator's decision. Plaintiffs appeal.

ISSUES AND STANDARDS OF REVIEW

¶22 Plaintiffs raise two issues on appeal. First, they contend that the district court erred in granting Defendants' motion to compel arbitration of the Contract Claim, the Good Faith Claim, and the Dissolution Claim. "Whether a trial court correctly decided a motion to compel arbitration is a question of law which we review for correctness, according no deference to the district judge." *MacDonald Redhawk Invs. v. Ridges at Redhawk, LLC*, 2006 UT App 491, ¶ 2, 153 P.3d 787 (cleaned up).

¶23 Second, Plaintiffs contend that the district court "incorrectly refused to stay the [arbitration] proceedings

and determine the market value of the [Clinic] . . . when the Dissolution Claim arose by statute and not by contract." The resolution of this issue likewise turns on whether the district court correctly compelled arbitration of the Dissolution Claim. We therefore review the district court's denial of Plaintiffs' motion to stay the arbitration proceedings for correctness. *See id.* To the extent that the resolution of this issue involves a question of statutory interpretation, we review the district court's interpretation of a statute for correctness. *Graham v. Albertson's LLC*, 2020 UT 15, ¶ 9, 462 P.3d 367.

## ANALYSIS

### I. Motion to Compel Arbitration

¶24 Plaintiffs contend that the district court erred in compelling the parties to arbitrate the claims at issue on appeal. They assert that the plain language of the Operating Agreement's arbitration provision "applies only to those disputes that involve the 'interpretation' of language in the Operating Agreement or the 'enforcement' of a term of the Operating Agreement." According to Plaintiffs, the Contract Claim, the Good Faith Claim, and the Dissolution Claim "are based on legal grounds that are independent of" the Operating Agreement because they "do not seek the 'enforcement or interpretation' of the Operating Agreement." Thus, Plaintiffs assert, those claims are not subject to arbitration.

¶25 We begin by setting forth the principles that guide whether these disputes are arbitrable. We then address each claim in turn.

A.     Guiding Principles

¶26    "In the event of a disagreement about whether there is an applicable agreement to arbitrate a dispute," *Mariposa Express, Inc. v. United Shipping Sols., LLC*, 2013 UT App 28, ¶ 16, 295 P.3d 1173 (cleaned up), the Utah Uniform Arbitration Act provides that "the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate," Utah Code Ann. § 78B-11-108(1)(b) (LexisNexis 2018). *See generally id.* §§ 78B-11-101 to -131 (the Utah Uniform Arbitration Act). The parties agree that there is an enforceable agreement to arbitrate. The sole question we must decide is whether the claims at issue fall within the scope of that agreement. Resolving this question depends on, first, the breadth of the arbitration provision and, second, the nature of the claims. *See CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014).

¶27    When interpreting agreements, Utah courts bear in mind "our policy of encouraging arbitration." *Central Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 16, 40 P.3d 599. Indeed, "it is the policy of the law in Utah to interpret contracts in favor of arbitration, in keeping with our policy of encouraging extrajudicial resolution of disputes when the parties have agreed not to litigate." *Id.* (cleaned up); *see also id.* ¶ 24 (reiterating "the strong policy of the law in Utah in favor of arbitration").

¶28    However, even with that policy in mind, the "intentions of the parties are controlling." *Id.* ¶ 12. And "we first look to the four corners of the agreement to determine the intentions of the parties." *Id.* (cleaned up). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.*; *see also Zions Mgmt. Services v. Record*, 2013 UT 36, ¶ 36, 305 P.3d 1062 ("State and federal policies favoring arbitration

cannot be used to defeat the plain language of the parties' contract, nor can they be used to create ambiguities where there are none." (cleaned up)).

¶29   The Operating Agreement's arbitration provision states, "Any Member involved in a dispute regarding the enforcement or interpretation of this Agreement may elect to have such dispute referred to . . . binding arbitration." Under this provision's plain language, only those disputes "regarding the enforcement or interpretation" of the Operating Agreement are subject to arbitration. "Enforcement" is the "act or process of compelling compliance with a law, mandate, command, decree, or agreement." *Enforcement*, Black's Law Dictionary (11th ed. 2019); *see also Enforcement*, Cambridge Dictionary, https://dictionary.cambridge .org/us/dictionary/english/enforcement [https://perma.cc/3TYQ-T8H3] (defining "enforcement" as "the process of making people obey a law or rule, or making a particular situation happen or be accepted"); *Enforce*, Merriam-Webster, https://www.merriam-webster.com/dictionary/enforcement [https://perma.cc/CG7X-E5XV] (stating that "enforce" means "to cause to take effect or to be fulfilled"). And "interpretation" is the "ascertainment of a text's meaning," especially the "determination of how a text most fittingly applies to particular facts." *Interpretation*, Black's Law Dictionary (11th ed. 2019); *see also Interpretation*, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary /american/interpretation [https://perma.cc/HG32-B3B4] (defining "interpretation" as "an explanation of the meaning or importance of something").

¶30   When it comes to examining the nature of claims to determine whether they fall within the scope of an arbitration provision, we again bear in mind Utah's strong policy favoring arbitration. *See Central Fla. Invs.*, 2002 UT 3, ¶¶ 16, 24; *Mariposa Express*, 2013 UT App 28, ¶ 17. Under that policy, when an arbitration agreement exists, "we encourage arbitration by liberal interpretation of the arbitration provisions themselves."

*Edwards v. Carey*, 2017 UT App 73, ¶ 13, 397 P.3d 797 (cleaned up). Given this approach to deciding the breadth of an arbitration provision, we similarly deem it appropriate to liberally interpret the nature of the claims at issue.

¶31    Utah law on the subject of how to examine the nature of claims in this context is sparse. We therefore "look to the law of other states and to federal case law for guidance on these issues." *Buzas Baseball, Inc. v. Salt Lake Trappers, Inc.*, 925 P.2d 941, 947 n.5 (Utah 1996) (explaining that where "Utah law on [an arbitration] issue is sparse," and where the relevant "provisions of the Utah Arbitration Act are nearly identical to those contained in the Federal Arbitration Act," we "look to the law of other states and to federal case law for guidance on" the issue). In this regard, the analysis of *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165 (3d Cir. 2014), is helpful to the issue at hand.

¶32    In *CardioNet*, the United States Court of Appeals for the Third Circuit explained that to assess "whether a particular dispute falls within the scope of an arbitration clause, we focus on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Id.* at 173 (cleaned up). This approach prevents "a creative and artful pleader from drafting around an otherwise-applicable arbitration clause." *Id.* (cleaned up). In other words, "the arbitrability of a given dispute depends not on the particular cause of action pleaded, but on the relationship of the arbitration clause at issue to the facts underpinning a plaintiff's claims." *Id.* at 176.

¶33    For instance, if an arbitration clause in an agreement is "limited in scope to disputes regarding the performance or interpretation of the Agreement," *id.* at 174 (cleaned up), and if certain claims depend on a document distinct from that agreement, the claims will fall outside the arbitration clause when "the resolution of [the] claims does not require construction of, or even reference to, any provision" in the agreement, *id.* at 175–76 (cleaned up). Similarly, the claims will

fall outside the scope of the arbitration clause when "interpreting the Agreement is not required, or even useful, in resolving" the claims. *Id.* at 176–77.

¶34 We now apply these principles to Plaintiffs' claims.

B. Plaintiffs' Claims

1. The Contract Claim

¶35 Plaintiffs argue that the Contract Claim "sought to enforce an *oral contract*" in which Artz agreed to purchase HITORQ's interest in the Clinic. Without addressing the nature of the Contract Claim itself, Plaintiffs generally assert that the action to enforce the oral purchase agreement is "not an action to 'enforce' or 'interpret' the Operating Agreement" given that they are "separate contracts." And because the purchase agreement lacks an arbitration clause, Plaintiffs maintain that the Contract Claim was not subject to arbitration.

¶36 Defendants respond that the Contract Claim "required the interpretation and enforcement of the Operating Agreement" because Plaintiffs alleged that the Operating Agreement "imposed certain requirements on the sale and purchase of LLC membership interests that governed the members' conduct in shaping and performing any buyout of interest." Defendants point to the complaint, which, in Defendants' view, alleged that "it was somehow a violation of the purchase agreement to not sell the [Real Estate Company] shares with the [Clinic] shares as required by" the Operating Agreement. They also point to the complaint's allegation that Artz and Vetmed breached the purchase agreement "by not paying the 'profits and accounts receivable' that were owed to Pasquarello," emphasizing that Pasquarello's "right to profits and receivables arose out of the Operating Agreement."

¶37 Applying the principles discussed above, we conclude that the district court did not err in ordering the Contract Claim into arbitration. On the face of the complaint, Plaintiffs' allegations about the purchase agreement involved a dispute about the enforcement or interpretation of the Operating Agreement. The facts underpinning Plaintiffs' claim regarding breach of the purchase agreement included Artz and Vetmed's alleged failure to "pay HITORQ its share of the profits and losses as well as the accounts receivable through the closing date, [and] continue thereafter to pay HITORQ its share of accounts receivable until they were paid in full." The underlying facts also included Artz and Vetmed preventing Pasquarello from working after November 13, 2015. These allegations called into question whether Plaintiffs' membership rights under the Operating Agreement had been respected, including whether Plaintiffs had been properly paid under the Operating Agreement and whether Pasquarello was entitled to work at the Clinic under the terms of the Operating Agreement. In addition, the Contract Claim involved Artz's failure to draft a written agreement with provisions for, among other things, "the payment of accounts receivable" and "the sale of the Real Estate membership." These missing provisions of the written purchase agreement implicated corresponding provisions of the Operating Agreement.

¶38 Because many of the factual underpinnings of the Contract Claim referenced the Operating Agreement, resolving the Contract Claim could require ascertaining or explaining the meaning of the Operating Agreement's provisions. *See Interpretation*, Black's Law Dictionary (11th ed. 2019). In other words, resolving allegations surrounding the Contract Claim could require "construction of" and "reference to" provisions of the Operating Agreement. *See CardioNet*, 751 F.3d at 175–76. As a result, the fact that the purchase agreement did not itself include an arbitration provision does not necessarily mean that the Contract Claim did not fall within the Operating Agreement's arbitration provision.

¶39 Moreover, it is significant that the Contract Claim sought damages from Vetmed, a party to the Operating Agreement but not alleged to be a party to the purchase agreement. By naming Vetmed as a party to a cause of action that alleged violations of the Operating Agreement, Plaintiffs apparently sought to compel Vetmed's compliance with the Operating Agreement. *See Enforcement*, Black's Law Dictionary (11th ed. 2019). Thus, resolving the Contract Claim, as against Vetmed in particular, also would require enforcement of the Operating Agreement.

¶40 We acknowledge that whether the Contract Claim involved a dispute regarding the enforcement or interpretation of the Operating Agreement, thus falling within its arbitration provision, is a close call. But we construe the nature of the Contract Claim broadly, given our strong policy in favor of arbitration. *See Central Fla. Invs.*, 2002 UT 3, ¶¶ 16, 24; *Edwards*, 2017 UT App 73, ¶ 13. And because Plaintiffs have not shown that their allegations fell outside the scope of the arbitration provision, they have not established error in the district court's decision. *See Nelson v. Liberty Acquisitions Servicing LLC*, 2016 UT App 92, ¶ 20, 374 P.3d 27 ("On appeal, the burden is upon the appellant to convince us that the trial court committed error." (cleaned up)). We therefore affirm the district court's decision that the Contract Claim was arbitrable.

2. The Good Faith Claim

¶41 Plaintiffs assert that the Good Faith Claim is not subject to arbitration for the same reasons as the Contract Claim. *See supra* ¶ 35. They do little to distinguish the two claims.

¶42 On the other hand, Defendants address the claims separately. They point out that the Good Faith Claim as stated in the complaint asserted "an entitlement" to the Clinic Debt Payments and that resolving whether Pasquarello was "entitled to any salary or distribution" after she stopped working at the Clinic "requires an interpretation" of the Operating Agreement's

provision "that a member 'shall not receive salary and disbursements' for missed workdays." Additionally, Defendants point out that the Good Faith Claim alleged that "it was somehow a breach for Artz to vote to expel Pasquarello from [the Clinic]." According to Defendants, this too "required interpretation of the Operating Agreement because the grounds for expulsion and the procedure for expulsion are set forth" in the Operating Agreement.

¶43 Applying the guiding principles set forth above, we similarly conclude that the district court did not err in ordering the Good Faith Claim into arbitration. Like the Contract Claim, which also primarily rested on the purchase agreement, the Good Faith Claim referenced provisions of the Operating Agreement. *See CardioNet*, 751 F.3d at 175–76. Indeed, the Good Faith Claim relied on allegations that Artz and Vetmed wrongfully deprived Plaintiffs of the Clinic Debt Payments. Because, as the complaint acknowledged, Plaintiffs' entitlement to the Clinic Debt Payments arose from the Operating Agreement, this aspect of the Good Faith Claim involved enforcing and ascertaining the meaning of the Operating Agreement's provisions regarding the Clinic Debt Payments. *See Enforcement*, Black's Law Dictionary (11th ed. 2019); *Interpretation*, Black's Law Dictionary (11th ed. 2019).

¶44 The Good Faith Claim also relied on and sought damages for Artz and Vetmed's expulsion of HITORQ as a member of the Clinic. Liberally construing the nature of the Good Faith Claim, *see Edwards*, 2017 UT App 73, ¶ 13, we agree with Defendants that because the procedure and grounds for expulsion are governed by the Operating Agreement, this aspect of the claim also involved a dispute over enforcement or interpretation of the Operating Agreement. Additionally, the fact that the Good Faith Claim was raised against Vetmed, a party to the Operating Agreement but not alleged to be a party to the purchase agreement, further suggested that resolving the claim would involve enforcement of the Operating Agreement.

¶45   Like the Contract Claim, whether the Good Faith Claim involved a dispute over the enforcement or interpretation of the Operating Agreement is a close question. But again, Plaintiffs have not sufficiently addressed the nature of the claim and have not done enough to show error in the district court's decision. *See Nelson*, 2016 UT App 92, ¶ 20. Accordingly, we affirm the district court's decision that the Good Faith Claim was subject to the arbitration provision.

3.      Dissolution Claim

¶46   Plaintiffs assert that "the right to dissolve a Utah limited liability company is based exclusively on statutory grounds." According to Plaintiffs, the Dissolution Claim "is based upon and seeks to enforce the [Utah Revised Uniform Limited Liability Company Act], not any provision of the Operating Agreement." Put differently, the Dissolution Claim "seeks a specific remedy authorized by . . . statute" and "does not seek to enforce any specific term of the Operating Agreement."

¶47   Defendants counter that Plaintiffs grounded the Dissolution Claim "in a very specific allegation that Artz and Stiens had violated [their] *membership* rights that were set forth in the [Clinic's] Operating Agreement." Defendants further assert that because Plaintiffs "specifically grounded" the Dissolution Claim in purported violations of the Operating Agreement, Plaintiffs' "alleged right to dissolution was contingent upon a finding that the [Operating Agreement] was being violated." According to Defendants, the Dissolution Claim asserted that "dissolution was necessary because Artz was withholding salary and/or distributions" from Plaintiffs, and that because the Operating Agreement provides that "distributions are *supposed* to stop once a member stops" working, it "was therefore necessary to interpret the Operating Agreement to resolve" the Dissolution Claim.

¶48 Because Plaintiffs insist that the Dissolution Claim presented purely a statutory issue, we begin by laying out the statute. It provides, in relevant part,

> A limited liability company is dissolved, and its activities and affairs must be wound up, upon the occurrence of any of the following:
>
> (1) an event or circumstance that the operating agreement states causes dissolution; [or] . . .
>
> (5) on application by a member, the entry by the district court of an order dissolving the limited liability company on the grounds that the managers or those members in control of the limited liability company:
>
> > (a) have acted, are acting, or will act in a manner that is illegal or fraudulent; or
> >
> > (b) have acted, are acting, or will act in a manner that is oppressive and was, is, or will be directly harmful to the applicant . . . .

Utah Code Ann. § 48-3a-701 (LexisNexis 2015).

¶49 Here, the Dissolution Claim alleged that good cause existed for judicial supervision of the winding up of the Companies. In making this claim, Plaintiffs seemed to invoke section 48-3a-701(5)(b), alleging that Defendants acted "in a manner that is illegal, oppressive, and directly harmful to Plaintiffs." Plaintiffs supported this ground for dissolution by alleging that Defendants denied them "the rights and benefits in both [Companies], changed the character, profits and losses of the Clinic[,] and devalued . . . Plaintiffs' membership."

¶50 Given these allegations as stated in the complaint, and the related factual underpinnings, we conclude that the Dissolution Claim involved "a dispute regarding the enforcement or interpretation of this Agreement." Plaintiffs tied the claim to whether Defendants' conduct was "illegal, oppressive, and directly harmful to Plaintiffs," and the specific conduct at issue included whether Defendants denied Plaintiffs "the rights and benefits of membership" in both Companies and denied them the "profits and losses of the Clinic." In fact, Plaintiffs agreed before the district court that the basis for the Dissolution Claim was that Plaintiffs, as members, were "not being granted the distributions and the right[s] that [they were] entitled to under the Operating Agreement." Deciding whether Plaintiffs were being granted distributions and receiving all to which they were entitled under the Operating Agreement inherently involves enforcing the Operating Agreement because it amounts to a process of "compelling compliance with [the] . . . agreement." *See Enforcement*, Black's Law Dictionary (11th ed. 2019). As alleged, the claim also involved an interpretation of the Operating Agreement's provisions, which establish and define Plaintiffs' rights. Thus, because the factual underpinnings of the Dissolution Claim—that Plaintiffs were being denied their rights under the Operating Agreement—constituted a dispute over the enforcement and the interpretation of the Operating Agreement, the claim was subject to arbitration. *See CardioNet*, 751 F.3d at 173 (focusing on "the factual underpinnings of the claim" to decide "whether a particular dispute falls within the scope of an arbitration clause" (cleaned up)).

¶51 In summary, we conclude that Plaintiffs have not shown error in the district court's decisions regarding the Contract Claim and the Good Faith Claim, and we conclude that the Dissolution Claim involved "a dispute regarding the enforcement or interpretation of [the Operating Agreement]." Consequently, Plaintiffs' claims are all subject to the Operating Agreement's arbitration provision. We therefore affirm the

district court's grant of Defendants' motion to compel the arbitration of these claims.[4]

## II. Motion to Stay the Arbitration Proceedings

¶52 Plaintiffs next contend that the district court erred in denying their request to stay the arbitration proceedings to value their interest in the Companies. Specifically, Plaintiffs assert that "the valuation proceeding," which was triggered by the filing of the notice of election to purchase, was not subject to the arbitration provision. In Plaintiffs' view, when they sought a stay and asked the district court to determine the fair market value of the Clinic, the court was required to grant the "stay to allow a prompt fair market valuation of the member's interest." Defendants counter that "[o]nce the [Dissolution Claim] was ordered into arbitration, all decisions related to dissolution or remedies in lieu of dissolution needed to be made by the Arbitrator and not by the district court." We agree with Defendants.

¶53 Utah Code section 48-3a-702 provides that in a proceeding to dissolve a company under Utah Code section 48-3a-701(5), "the limited liability company may elect, or if it fails to elect, one or more members may elect to purchase the interest in the

---

4. Plaintiffs also contend that the district court incorrectly denied their motion to vacate the arbitration award and incorrectly confirmed the arbitration award. In particular, Plaintiffs assert "the arbitrator exceeded his authority by deciding the dissolution and oral contract claims" because the claims "do not concern the 'enforcement or interpretation'" of the Operating Agreement. This contention is thus tethered to Plaintiffs' first contention that the claims are not arbitrable. Indeed, Plaintiffs tell us that the "sole focus for this Court is the arbitrability of claims." Because we reject Plaintiffs' first contention, it follows that this contention is likewise unavailing.

limited liability company owned by the applicant member [i.e., the member seeking dissolution,] at the fair market value of the interest." Utah Code Ann. § 48-3a-702(1) (LexisNexis 2015). Thus, in lieu of dissolution, the limited liability company or its members instead may elect to purchase the interest of the applicant member. *See id.*; *see also id.* § 48-3a-702(13) (stating that after a court orders the purchase of the applicant member's interest, the court "shall dismiss the petition to dissolve the limited liability company under Subsection 48-3a-701(5)").

¶54   In this case, after Plaintiffs filed the Dissolution Claim and thereby initiated dissolution proceedings under section 48-3a-701(5), two members of the Clinic—TCC and Vetmed— invoked section 48-3a-702(1), filing notice of their election to purchase HITORQ's interest in the Clinic in lieu of the Clinic's dissolution. The election to purchase cannot be viewed in isolation. Rather, the election to purchase filed under section 48-3a-702(1) flows from, and is intertwined with, the dissolution proceeding initiated under section 48-3a-701(5). Although Plaintiffs essentially view "the valuation proceeding" as distinct from the Dissolution Claim, the election to purchase was filed in response to, and as part of, the dissolution proceeding. *See id.* § 48-3a-702(1). Instead of commencing a separate "valuation proceeding," Artz and Vetmed's election to purchase presented an issue about the possible remedies for Plaintiffs' claim that the Companies should be dissolved. And once the Dissolution Claim was before the arbitrator, the arbitrator was authorized to address and resolve the election-to-purchase issue. *See id.* § 78B-11-122(3) (2018) (explaining that other than awards of punitive damages and attorney fees, "an arbitrator may order any remedies as the arbitrator considers just and appropriate under the circumstances of the arbitration proceeding"). Hence, the arbitrator, not the court, was called on to resolve the election-to-purchase issue, and we agree with the district court that when the Dissolution Claim was sent to arbitration, the election-to-purchase issue was also compelled into arbitration.

¶55 Because we have already determined that the district court correctly ordered the Dissolution Claim into arbitration, *supra* ¶¶ 48–50, we reject Plaintiffs' position that "the valuation proceeding" was not subject to the arbitration provision. We thus affirm the court's refusal to stay the arbitration proceedings.

### III. Attorney Fees on Appeal

¶56 Defendants request that we award them the attorney fees that they have incurred in defending this appeal. In so doing, they rely on *Buzas Baseball, Inc. v. Salt Lake Trappers, Inc.*, 925 P.2d 941 (Utah 1996), a case that rests on a statute that since has been revised. *See id.* at 952–54 (citing Utah Code Ann. § 78-31a-16 (Michie 1992)). The current version of that statute authorizes this court to award reasonable attorney fees on an appeal from an order confirming an arbitration award. *See* Utah Code Ann. § 78B-11-126(3) (LexisNexis 2018) ("On application of a prevailing party to a contested judicial proceeding under [the sections governing confirmation, vacatur, and modification of an arbitrator's award], the court may add reasonable attorney fees and other reasonable expenses of litigation incurred in [such a] proceeding . . . ."); *see also Duke v. Graham*, 2007 UT 31, ¶ 30, 158 P.3d 540 (indicating that "[b]ecause an appeal is a contested judicial proceeding after an arbitration award is made," this statute "also authorizes courts to award fees for appeals relating to the validity of an arbitration award").

¶57 The award of attorney fees under Utah Code section 78B-11-126(3) "is not automatic"; rather, the decision falls within the discretion of the court. *Duke*, 2007 UT 31, ¶ 31. Our supreme court has instructed that in exercising this discretion, courts should take into consideration the competing policies underlying the statute. *Id.* ¶¶ 31–32. On the one hand is the "policy of finality," which "favor[s] the enforceability of arbitration awards and discourage[s] relitigation of valid awards." *Id.* ¶ 31 (cleaned up). On the other hand, courts "must balance the need not to unduly burden parties with the threat of

fees when they have legitimate concerns about the legal validity of an award." *Id.* For example, an "appeal that has little legal support would likely merit an award of fees to discourage unnecessary delays and costs in enforcing an award, while a close case would not." *Id.* ¶ 32.

¶58 Defendants have the burden to show why they are entitled to attorney fees on appeal. *See* Utah R. App. P. 24(a)(9) ("A party seeking attorney fees for work performed on appeal must state the request explicitly and set forth the legal basis for an award."). But aside from citing *Buzas Baseball* and tersely stating that they are entitled to such an award, they have done little to support their request. Critically, Defendants have not addressed the relevant policies and have not articulated why an award of attorney fees on appeal is warranted under the circumstances of this case, one in which we have determined that two of Plaintiffs' arguments are close calls. Without more, and given that the award of attorney fees in this context is "not automatic," we decline to grant Defendants' request. *See Duke*, 2007 UT 31, ¶ 31.

## CONCLUSION

¶59 The district court did not err in ordering the parties to arbitrate the Contract Claim, the Good Faith Claim, and the Dissolution Claim. Similarly, the district court did not err in declining to stay the arbitration proceedings. Accordingly, we affirm.

———————