Cite as 2022 Ark. App. 52

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-20-671

| | |
|---|---|
| MIDLAND FUNDING, LLC; AND MIDLAND CREDIT MANAGEMENT, INC. | **Opinion Delivered** February 2, 2022 |
| APPELLANTS | APPEAL FROM THE INDEPENDENCE COUNTY CIRCUIT COURT [NO. 32CV-20-56] |
| V. | |
| JENNIFER BRIESMEISTER, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED | HONORABLE HOLLY MEYER, JUDGE |
| APPELLEES | REVERSED AND REMANDED |

## KENNETH S. HIXSON, Judge

Midland Funding, LLC (Midland Funding), and Midland Credit Management, Inc. (Midland Credit), (collectively appellants or Midland) appeal after the Independence County Circuit Court denied their motion to compel arbitration and strike class allegations in favor of appellee Jennifer Briesmeister on behalf of herself and all others similarly situated. On appeal, appellants argue that the circuit court erred in denying their motion. We reverse and remand.

I. *Relevant Facts*

Much of the facts of this case are undisputed. In December 2015, Briesmeister opened an Amazon-branded credit card issued by Synchrony Bank (Synchrony). She made purchases on the credit card, and the last payment she made on the account was on May 18, 2018, leaving a balance of $1,108.61. Synchrony charged off the account on September 25,

2018, and subsequently sold the account to Midland Funding on October 20, 2018. The bill of sale between Synchrony and Midland Funding stated the following in pertinent part:

> For value received and in further consideration of the mutual covenants and conditions set forth in the Forward Flow Accounts Purchase Agreement (the "Agreement"), dated as of the 9th day of February, 2018 by and between Synchrony Bank formerly known as GE Capital Retail Bank; RFS Holding, L.L.C.; and Retail Finance Credit Services, LLC (collectively "Seller") and Midland Funding LLC ("Buyer"), *Seller hereby transfers, sells, conveys, grants, and delivers to Buyer, its successors and assigns, without recourse except as set forth in the Agreement, the Accounts as set forth in the Notification Files, delivered by Seller to Buyer on October 20, 2018*, and as further described in the Agreement.

(Emphasis added.)

The credit-card agreement between Synchrony and Briesmeister in effect at the time of sale contained the following pertinent provisions:

**ABOUT THE CREDIT CARD AGREEMENT**

**This Agreement.** This is an Agreement between you and Synchrony Bank . . . for your credit card account shown above. By opening or using your account, you agree to the terms of the entire Agreement. The entire Agreement includes the four sections of this document and the application you submitted to us in connection with the account. These documents replace any other agreement relating to your account that you or we made earlier or at the same time.

**Parties To This Agreement.** This Agreement applies to each accountholder approved on the account and each of you is responsible for paying the full amount due, no matter which one uses the account. We may treat each of you as one accountholder and may refer to each of you as "you" or "your." Synchrony Bank may be referred to as "we," "us" or "our."

. . . .

**IMPORTANT INFORMATION ABOUT THIS AGREEMENT**

**Assignment.** We may sell, assign or transfer any or all of our rights or duties under this Agreement or your account, including our rights to payments. We do not have to give you prior notice of such action. You may not sell, assign or transfer any of your rights or duties under this Agreement or your account.

**Enforceability.** If any part of this Agreement is found to be void or unenforceable, all other parts of this Agreement will still apply.

**Governing Law.** Except as provided in the Resolving a Dispute with Arbitration section, this Agreement and your account are governed by federal law and, to the extent state law applies, the laws of Utah without regard to its conflicts of law principles. This Agreement has been accepted by us in Utah.

**Waiver.** We may give up some of our rights under this Agreement. If we give up any of our rights in one situation, we do not give up the same right in another situation.

**RESOLVING A DISPUTE WITH ARBITRATION**

**PLEASE READ THIS SECTION CAREFULLY, IF YOU DO NOT REJECT IT, THIS SECTION WILL APPLY TO YOUR ACCOUNT, AND MOST DISPUTES BETWEEN YOU AND US WILL BE SUBJECT TO INDIVIDUAL ARBITRATION. THIS MEANS THAT: (1) NEITHER A COURT NOR A JURY WILL RESOLVE ANY SUCH DISPUTE; (2) YOU WILL NOT BE ABLE TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING; (3) LESS INFORMATION WILL BE AVAILABLE; AND (4) APPEAL RIGHTS WILL BE LIMITED.**

- **What claims are subject to arbitration**

  1. If either you or we make a demand for arbitration, you and we must arbitrate any dispute or claim between you or any other user of your account, and us, our affiliates, agents and/or Amazon.com if it relates to your account, except as noted below.

  2. We will not require you to arbitrate: (1) any individual case in small claims court or your state's equivalent court, so long as it remains an individual case in that court; or (2) a case we file to collect money you owe us. However, if you respond to the collection lawsuit by claiming any wrongdoing, we may require you to arbitrate.

  3. Notwithstanding any other language in this provision, only a court not an arbitrator, will decide disputes about the validity, enforceability, coverage or scope of this provision or any part thereof (including, without limitation, the next paragraph of this provision and/or this sentence). However, any dispute or argument that concerns the validity or

enforceability of the Agreement as a whole is for the arbitrator, not a court, to decide.

- **No Class Actions**

  **YOU AGREE NOT TO PARTICIPATE IN A CLASS, REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL ACTION AGAINST US IN COURT OR ARBITRATION. ALSO, YOU MAY NOT BRING CLAIMS AGAINST US ON BEHALF OF ANY ACCOUNTHOLDER WHO IS NOT AN ACCOUNTHOLDER ON YOUR ACCOUNT, AND YOU AGREE THAT ONLY ACCOUNTHOLDERS ON YOUR ACCOUNT MAY BE JOINED IN A SINGLE ARBITRATION WITH ANY CLAIM YOU HAVE.**

. . . .

- **Governing Law for Arbitration**

  This Arbitration section of your Agreement is governed by the Federal Arbitration Act (FAA). Utah law shall apply to the extent state law is relevant under the FAA. The arbitrator's decision will be final and binding, except for any appeal right under the FAA. Any court with jurisdiction may enter judgment upon the arbitrator's award.

- **How to reject this section**

  **You may reject this Arbitration section of your Agreement. If you do that, only a court may be used to resolve any dispute or claim. To reject this section, you must send us a notice within 60 days after you open your account or we first provided you with your right to reject this section. . . . This is the only way you can reject this section.**

(Bold font in original.)

After the account was sold, Midland Funding filed a complaint against Briesmeister in Independence County District Court on January 27, 2020, requesting a judgment for the past unpaid balance, interest, and costs. A summons was subsequently served on Briesmeister on February 4, 2020, informing her that she had thirty days after service of the summons to

4

file a written answer to the complaint. Three days after service of summons, Midland Credit (an affiliate of Midland Funding that manages and acts as a "servicer" for the consumer debt purchased by Midland Funding) sent Briesmeister a letter on behalf of Midland Funding, stating the following:

> You were served with a copy of the lawsuit Midland Funding LLC filed against you. Call (866) 300-8750 to discuss your options.
>
> If we can't resolve this out of court, we intend to continue with this lawsuit and will request the judge grant Midland Funding LLC a judgment for the full balance owed.
>
> Reply by: March 08, 2020

It is this letter that precipitated the current litigation.[1]

On March 23, 2020, Briesmeister filed her complaint against appellants in the Circuit Court of Independence County. (The Midland Funding collection suit was filed in district court.) She claimed that appellants' actions violated the Arkansas Fair Debt Collection Practices Act (AFDCPA). Specifically, Briesmeister alleged that the collection letter sent by Midland Credit is misleading because the letter contains a "reply by" date to resolve the claim amicably that is after the date she was required to file an answer in circuit court. Briesmeister further alleged that the letter did not disclose that the deadlines in the summons must be complied with regardless of the date given in the letter. In other words, Briesmeister alleged that she would have been in default in the lawsuit filed by Midland Funding prior to the "reply by" date in Midland Credit's letter. Briesmeister claimed that

---

[1]It is unclear from our record on appeal how Midland Fundings's complaint filed in district court was resolved. However, we note that Briesmeister states in her subsequent complaint filed in circuit court that the case was dismissed. Regardless, the disposition of Midland Funding's previous complaint is not material to our resolution of this interlocutory appeal filed pursuant to Rule 2(a)(12) of the Arkansas Rules of Appellate Procedure–Civil.

these actions violated the AFDCPA and filed her complaint on behalf of herself and on behalf of a class of individuals similarly situated.

Thereafter, appellants moved to compel arbitration and strike class allegations under the terms of the credit-card agreement between Synchrony and Briesmeister as quoted above. Appellants argued that "[a]s servicer for Synchrony's assignee and current owner of Synchrony's defaulted Synchrony account, [appellants are] entitled to enforce Briesmeister's agreement to arbitrate her claims against [appellants] on an individual (as opposed to class-wide) basis." Appellants further argued that "[b]ecause Briesmeister's claims are premised upon [appellants'] alleged conduct in attempting to collect her defaulted Synchrony account, those claims necessarily relate to her Synchrony account and are precisely the type of claims encompassed by the arbitration provision and class-action waiver included in the applicable agreement."

Briesmeister filed her response to the motion to compel arbitration and strike class allegations on June 11, 2020. She argued that appellants were not covered by the arbitration clause because the Synchrony card agreement defined "we," "us," and "our" as Synchrony Bank—not Midland Funding or Midland Credit. Although Briesmeister acknowledged that the agreement in another section stated that Synchrony could "sell, assign or transfer any or all of our rights or duties under this agreement or your account," she argued that (1) appellants had not shown that any right to require arbitration was assigned, (2) the language of the arbitration clause did not cover claims against appellants based on their own conduct, and (3) appellants' contract-construction arguments are based on an impermissible rewriting of the contract. Alternatively, Briesmeister argued that because Midland Funding had

6

previously filed a lawsuit to collect the debt in the Independence County District Court, appellants had waived any otherwise applicable arbitration clauses with respect to improper behavior.

Appellants filed their reply on June 17, 2020, essentially arguing that Briesmeister was mistaken because Synchrony's assignment allowed appellants to "Step into its Shoes" as the original creditor. Appellants further argued that as the assignee to the original creditor, appellants could enforce the arbitration clause as written. Finally, appellants argued that Briesmeister's contention that appellants waived their right to compel arbitration was without merit.

A hearing was held on the motion to compel arbitration on August 18, 2020, and counsel for the parties orally argued their respective positions as already set out above.[2] The circuit court thereafter entered an order denying appellants' motion to compel arbitration and strike class allegations on September 22, 2020. In that order, the circuit court made the following pertinent findings:

> 10. Based on the parties' briefs, the evidence presented with the briefs and filed under seal, and the arguments made by the parties at the hearing, the Court makes the following findings of facts and conclusions of law.

---

[2]During the hearing, a question was raised regarding a "Forward Flow Purchase Agreement" that was referenced in Midland Funding's bill of sale with Synchrony. Appellants' counsel offered to supplement the record with a copy of that agreement for the circuit court's consideration. The circuit court therefore took the matter under advisement until after the record was supplemented. On September 9, 2020, appellants filed their unopposed motion for leave to file under seal, requesting to file a Forward Flow Purchase Agreement under seal. The circuit court granted appellants' motion on September 10, 2020, and appellants filed the Forward Flow Purchase Agreement under seal on September 15, 2020.

7

11.     There is a binding contract between Plaintiff and Synchrony Bank to compel arbitration and prevent class action status between Plaintiff and Synchrony Bank.

12.     The assignment of Plaintiff's account to Defendant Midland Funding LLC does not, however, revise the contract nor expand the scope of the contract, to also bind Plaintiff to arbitration and prevent class action status regarding the alleged violations of the AFDCPA [Arkansas Fair Debt Collection Practices Act] which is the matter in controversy in this lawsuit.

13.     In summary, there is no binding arbitration agreement between the parties as to this lawsuit regarding Defendants' alleged violations of the AFDCPA and there is no binding agreement barring class action status between the parties to this suit regarding Defendant's alleged violations of the AFDCPA.

14.     Based on the foregoing, the Court finds Defendants' Motion to Compel Arbitration and Strike Class Allegations should be and hereby is denied.

This interlocutory appeal followed.

## II.  *Choice of Law*

The complaint filed by Briesmeister alleges a violation of the AFDCPA, codified at Arkansas Code Annotated sections 17-24-501 et seq. (Repl. 2018).  The arbitration clause in the Synchrony credit–card agreement provides that the arbitration section of the credit–card agreement is governed by the Federal Arbitration Act (FAA) but that Utah law shall apply to the extent state law is relevant under the FAA.  We have held that when the parties designate in the arbitration agreement which arbitration statute they wish to have control, the court should apply their choice.  *See Terminix Int'l Co., LLC v. Trivitt*, 104 Ark. App. 122, 289 S.W.3d 485 (2008); *see also E-Z Cash Advance, Inc. v. Harris*, 347 Ark. 132, 60 S.W.3d 436 (2001) (applying Arkansas law to an arbitration clause that stated, "This Agreement will be governed by the laws of the State of Arkansas"); *PC Scale, Inc. v. Roll Off Servs., Inc.*, 2010 Ark. App. 745, 379 S.W.3d 649 (applying California choice of law to

8

an arbitration clause that stated, "This Agreement is made and executed with the intention that the construction, interpretation, validity, and enforcement hereof shall be determined in accordance with, and governed by, the laws of the State of California, exclusive of its choice of law provisions"). Therefore, the law of Utah shall apply to the extent state law is relevant under the FAA.

The FAA makes arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has consistently required courts to place arbitration agreements on equal footing with all other contracts and enforce them according to their terms. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, at 339 (2011). While the FAA establishes a liberal federal policy that favors arbitration agreements, arbitration is "a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986).

It is well established in Utah that "[i]f the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language." *Zions Mgmt. Servs. v. Rec.*, 305 P.3d 1062 (Utah 2013) (quoting *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 40 P.3d 599 (Utah 2002)). Additionally, Utah courts have explained that any doubts and ambiguities will be resolved in favor of arbitration. *HITORQ, LLC v. TCC Veterinary Servs., Inc.*, 2021 UT 69 (Utah 2021). Arbitration is a matter of contract law, and state-law principles of contract formation apply. *Ellsworth v. Am. Arb. Ass'n*, 148 P.3d 983 (Utah 2006). In order to require a party to submit to arbitration, there must be an agreement to arbitrate. *Id.* The general rule of arbitration

9

agreements is that one who has not manifested assent to an agreement to arbitrate cannot be required to submit to arbitration. *Id.* If there is any question as to whether the parties agreed to resolve their disputes through arbitration or litigation, we are to interpret the agreement keeping in mind Utah's policy of encouraging arbitration and to interpret contracts in favor of arbitration. *Cent. Fla. Invs.*, 40 P.3d 599.

After determining there is an enforceable agreement to arbitrate, we must next determine whether the claims at issue fall within the scope of that agreement. *HITORQ LLC*, 473 P.3d 1177. Resolving this question depends on, first, the breadth of the arbitration provision and, second, the nature of the claims. *Id.* We look to the four corners of the agreement and the plain meaning of the contractual language to determine the intentions of the parties. *Id.* Utah encourages a liberal interpretation of the arbitration provisions themselves in deciding the breadth of an arbitration provision and the nature of the claims at issue. *Id.* Moreover, the Utah Supreme Court recently noted that Utah law on the subject of how to examine the nature of claims is sparse and looked to other state and federal case law for guidance. *Id.* It adopted an approach announced by the Unites States Court of Appeals for the Third Circuit and explained that in assessing whether a particular dispute falls within the scope of an arbitration clause, the focus should be on the factual underpinnings of the claim rather than the legal theory alleged in the complaint. *Id.* In other words, the arbitrability of a given dispute depends not on the particular cause of action pleaded but on the relationship of the arbitration clause at issue to the facts underpinning a plaintiff's claims. *Id.*

III. *Standard of Review*

While FAA law and Utah law govern the substantive law in this matter, Arkansas procedural law governs the procedure of this appeal. *See Am. Physicians Ins. Co. v. Hruska*, 244 Ark. 1176, 428 S.W.2d 622 (1968); *see also BDO Seidman, LLP v. SSW Holding Co.*, 2012 Ark. 1, 386 S.W.3d 361 (citing Arkansas law despite the arbitration provision's choice-of-law provision for our standard of review on appeal); *Terminix Int'l*, 104 Ark. App. 122, 289 S.W.3d 485 (citing Arkansas Rules of Appellate Procedure–Civil as governing the appeal). An order denying a motion to compel arbitration is an immediately appealable order. Ark. R. App. P.–Civil 2(a)(12). On appeal, this court reviews a circuit court's order denying arbitration de novo on the record. *Jorja Trading, Inc. v. Willis*, 2020 Ark. 133, 598 S.W.3d 1. We decide the issues on appeal using the record developed in the circuit court without deference to the circuit court's ruling. *JS Ark. Five Healthcare, LLC v. Gilbreath*, 2020 Ark. App. 405, 609 S.W.3d 445. Our court is not bound by the circuit court's decision; however, in the absence of a showing the circuit court erred in its interpretation of the law, the court will accept its decision as correct on appeal. *Id.*

IV. *Whether Midland Can Enforce the Arbitration Provision
in the Synchrony Credit-Card Agreement.*

Appellants argue on appeal that the circuit erred in denying their motion to compel arbitration. Briesmeister does not dispute that there is an enforceable arbitration agreement[3] between her and Synchrony or that the credit card agreement is itself assignable. The gist

---

[3]Because there are several agreements referred to in this opinion, we will hereinafter refer to the arbitration agreement contained within the Synchrony card agreement as the "arbitration provision."

of Briesmeister's claims is twofold: (1) Because the arbitration provision is limited to "us," "we," and "ours," those are words of limitation and inure only to the benefit of Synchrony and cannot be assigned to Midland Funding; (2) Assuming arguendo that the arbitration provision was assigned to Midland Funding, the scope of the arbitration provision does not extend to independent postassignment acts of Midland during the collection process.

The circuit court issued findings of fact and conclusions of law. Pertinent to this appeal, the circuit court made the following findings.

11. There is a binding contract between Plaintiff and Synchrony Bank to compel arbitration and prevent class action status between Plaintiff and Synchrony Bank.

12. The assignment of Plaintiff's account to Defendant Midland Funding LLC does not, however, revise the contract nor expand the scope of the contract, to also bind Plaintiff to arbitration and prevent class action status regarding the alleged violations of the AFDCPA which is the matter in controversy in this lawsuit.

13. In summary, there is no binding arbitration agreement between the parties as to this lawsuit regarding Defendants' alleged violations of the AFDCPA and there is no binding agreement barring class action status between the parties to this suit regarding Defendant's alleged violations of the AFDCPA.

Our analysis begins with Briesmeister's proposition that "us," "we," and "ours" are words of limitation and inure only to the benefit of Synchrony and cannot be assigned to Midland Funding. It appears that Utah has not definitively interpreted this phrase as it applies to an assignment of an arbitration provision. However, several other states have undertaken this task. The U.S. District Court in *Warner v. Midland Funding, LLC*, No. 1:18CV727, 2021 WL 3432556, at *4–5 (M.D.N.C. Aug. 5, 2021), interpreted a similar contractual provision and similar argument and held the following:

To that end, Plaintiff argues that the words "we," "us," and "our" in that Arbitration Provision are not defined to include assignees of Comenity.

12

Plaintiff's argument is convoluted and inexplicably contradictory. Plaintiff first argues that the words "we," "us," and "our" have a different definition when they are used in the Arbitration Provision section of the Credit Card Agreement than when they are used throughout the rest of the Credit Card Agreement. Plaintiff then appears to argue that the dispute between the parties is not arbitrable because the dispute is against Midland, not Comenity, and the scope of the Arbitration Provision is limited to claims between him and Comenity. Plaintiff reads the Arbitration Provision as not authorizing assignees to enforce this provision. According to Plaintiff the only entities with the authority to elect arbitration are Comenity; any parent, subsidiary, or affiliate of Comenity; and any other person or company that provides services in connection with the Credit Card Agreement.

Plaintiff's position is contrary to Delaware law which provides that an assignee "step[s] into the shoes of the assignor" upon assignment. *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001). As established above, as Comenity's assignee, Midland enjoys the same rights that were enjoyed by Comenity, including its right to elect arbitration. Moreover, to conclude otherwise would render other parts of the Credit Card Agreement surplusage. It is a fundamental principle of contract law that a contract should be read as a whole. *See Bank of N.Y. Mellon v. Commerzbank Capital Funding Tr. II*, 65 A.3d 539, 549 n.30 (Del. 2013) (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)). Thus, Midland has presented sufficient evidence to establish that they may enforce the arbitration agreements entered between Plaintiffs and Midland's predecessors in interest.

(Some internal citations omitted.)

Similarly, the Ohio U.S. District Court reached the same conclusion under analogous facts:

Plaintiff first contends that the Account transfer did not include the right to arbitrate. Second, she argues that because the arbitration clause itself narrowly defines the terms "we," "us," and "our" in a manner that does not include assignees, assignees are not given the same rights to enforce arbitration. . . . Defendant contends that by assigning all rights under the Account to Midland Funding, Comenity inherently assigned its right to enforce arbitration. In other words, Defendant argues that, after assignment, Midland Funding had whatever rights Comenity had, including arbitration, regardless of whether Comenity was defined in the Card Agreement to include assignees.

As a principle matter, an "assignee stands in the shoes of the assignor and assumes the same rights, title, and interest possessed by the assignor." *Exel, Inc. v. S.*

13

*Refrigerated Transp., Inc.*, 807 F.3d 140, 149 (6th Cir. 2015) (citing *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 672 F.3d 434, 439 (6th Cir. 2012)).  Generally, then, an assignee like Midland Funding "stands in the shoes" of an assignor with respect to the contract and its rights and obligations.  The assignment of an arbitration clause operates no differently. . . .

Here, Plaintiff's arguments fail to convince the Court that the right to arbitrate was not assigned.

First, she argues that only the title to the Account and any unpaid balance were assigned to Midland Funding.  . . . But the Bill of Sale itself explicitly states: "Comenity Bank . . . hereby assigns . . . *all rights*, title and interest of [Comenity] in and to [Plaintiff's] Account . . . for all purposes." . . . Given the use of "all rights" in the Bill of Sale, the Court finds that the plain language supports the conclusion that "all rights under the Account . . . for all purposes" includes the right to compel arbitration.

Second, Plaintiff argues that, even if assignment included "all rights," the arbitration clause itself changes the definition of certain terms such that no party other than Comenity or its affiliates can compel arbitration.  In other words, Plaintiff argues that even if the arbitration clause is technically assignable, the language of that clause renders it unassignable as a practical matter because, by the plain language, no one other than Comenity or its affiliates can compel arbitration, even after assignment.  Thus, the question here is whether the language in the arbitration clause providing a different definition of "we," "us," and "our" than is used in the remainder of the Card Agreement affects the Court's analysis.

But this is a distinction without a difference for the present purposes.  What matters in this analysis is that, even in the arbitration clause, Comenity retained the right to compel arbitration.  Because Midland Funding steps into Comenity's shoes after assignment, Midland Funding obtains the right to compel arbitration.

This result comports with that in many other courts that have analyzed the same argument Plaintiff makes here. . . .

In sum, the Court finds that a valid agreement to arbitrate exists, that Midland Funding was assigned the right to enforce that agreement, and that, in turn, Defendant has the right to compel arbitration against Plaintiff as Midland Funding's agent and wholly owned subsidiary.

*Little v. Midland Credit Mgmt., Inc.*, No. 2:19-CV-5419, 2021 WL 1382257, at *3–4 (S.D.

Ohio Feb. 24, 2021) (footnotes omitted).

We note that in the case at bar, similar to *Warner* and *Little*, the Synchrony credit-card agreement with Briesmeister provides the following: "**Assignment.** We may sell, assign or transfer any or all of our rights or duties under this Agreement or your account, including our rights to payments." (Bold in original.) And the sales-agreement documents between Synchrony and Midland Funding provide that "[s]eller [Synchrony] shall sell and Buyer [Midland Funding] shall buy *all right* (including the right to legally enforce, file suit, settle or take any similar action with respect to such Account) *title, and interest* in and to the Accounts[.]" (Emphasis added.)

To counter appellant's arguments in light of the holdings of *Warner* and *Little*, Briesmeister cites *Mims* as persuasive authority in support of her arguments. *Mims v. Glob. Credit & Collection Corp.*, 803 F. Supp. 2d 1349 (S.D. Fla. 2011). In *Mims*, Capital One Bank sold all rights it had in a past-due account to EAF. *Id.* EAF, in turn, hired an independent contractor to collect the unpaid balance on the account, and the account holder subsequently sued the independent contractor. *Id.* The *Mims* court rejected—for multiple reasons—the independent contractor's contention that Capital One Bank's customer agreement allowed it to compel arbitration. *Id.* The *Mims* court held that the independent contractor had waived its right to compel arbitration even if it had such a right, but the court went on to also hold that the agreement contained nothing to suggest that Capital One Bank and the account holder intended the agreement to benefit the independent contractor. *Id.* Its decision turned, in part, on additional language that is not contained in the contract at issue here. As such, we find *Warner* and *Little* to be more persuasive than *Mims*.

While Utah has not specifically interpreted whether "us," "we," and "ours" are words of limitation and only inure to the benefit of the assignor under these circumstances, Utah has interpreted a similar argument in deciding whether an assignee "stands in the shoes" of the assignor.

> It is well recognized that "[t]he assignee [stands] in the shoes of the assignor." 9 John E. Murray, Jr., *Corbin on Contracts* § 51.1 (rev. ed. 2007). Therefore, " '[t]he assignee is subject to any defenses that would have been good against the [assignor]; the assignee cannot recover more than the assignor could recover; and the assignee never stands in a better position than the assignor.' " *SME Indus.* [*Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*], 2001 UT 54, ¶ 16, 28 P.3d 669 (second alteration in original) (emphasis omitted) (quoting 6 Am. Jur. 2d *Assignments* § 144 (1999)). "[A]n assignee gains nothing more, and acquires no greater interest than had his assignor." *Aird Ins. Agency v. Zions First Nat'l Bank*, 612 P.2d 341, 344 (Utah 1980) (citing *Cheney v. Rucker*, 14 Utah 2d 205, 381 P.2d 86, 91 (1963)). In other words, "the common law puts the assignee in the assignor's shoes, whatever the shoe size." *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 289 (7th Cir. 2005).
>
> . . . .
>
> For guidance on these questions, we look further into the purpose behind the maxim that an assignee stands in the shoes of its assignor. *Corbin on Contracts* states, "[t]he essential purpose of the principle is to protect the obligor, the party who must perform the correlative duty of the assigned right," so that the risk to the obligor is not materially enlarged over the risk created by its agreement with the assignor. [ 9 John E. Murray, Jr., *Corbin on Contracts* § 51.1 (rev. ed. 2007)]. In other words, the purpose behind the rule is that an assignee has rights and liabilities identical to those of its assignor. We believe that the relationship between the assignee and obligor is not best characterized as a form of privity, but rather as a continuation of the rights and liabilities of the assignor as evidenced by the assigned agreements and any further limitations stated in the assignment itself.

*Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 230 P.3d 1000, at 1003–04 (Utah 2010).

In reviewing the Synchrony credit-card agreement and the bill-of-sale documents between Synchrony and Midland Funding, and applying Utah law, we hold that the language is clear and unambiguous when read as a whole and that Midland Funding steps into the shoes of Synchrony in this arbitration-provision assignment. Further, even if we

were to hold that the pertinent language is ambiguous, Utah law requires us to interpret any ambiguities in favor of arbitration. And finally, we disagree with Briesmeister's argument that such an interpretation revises or expands the arbitration provision. Based on the record presented, we hold that the arbitration provision was assigned to Midland, that Midland stands in the shoes of Synchrony, and Midland may enforce the arbitration provision if the claim made by Briesmeister falls within the scope of the arbitration provision.

That leads us to the second prong of appellee's argument, and that is that the independent postassignment conduct of Midland is not within the scope of the Synchrony arbitration provision. Specifically, Briesmeister argues that the letter written by Midland Credit occurred after the Synchrony assignment; therefore, Midland's conduct that allegedly violated the AFDCPA is not subject to the Synchrony arbitration provision.

Recall, the arbitration provision states, "If either you or we make a demand for arbitration, you and we must arbitrate any dispute or claim *between you* or any other user of your account, *and us*, our affiliates, agents and/or Amazon.com *if it relates to your account*." (Emphasis added.) Briesmeister argued below, and the circuit court agreed, that her claims alleging a violation of the AFDCPA did not fall within the scope of the agreement. Briesmeister argues that her claims had nothing to do with Synchrony's conduct and that her claims complain of the actions taken only by appellants in their postassignment attempt to collect the debt owed on her account. In other words, Briesmeister argues on appeal that her claims do not fall within the scope of the credit-card agreement because they were "based entirely on the post-purchase conduct of the Midland entities." Briesmeister acknowledges that the words "relates to your account" are broad; however, she again argues

17

that the dispute had to be between her and "us," meaning Synchrony. However, for the same reasons already discussed above, Midland Funding as the assignee stepped into the shoes of Synchrony. Since Midland stepped into the shoes of Synchrony, the scope of the arbitration provision may be effectively interpreted as "any dispute or claim between you [Briesmeister] . . . and us [Midland Funding], our [Midland Funding's] affiliates, agents and/or Amazon.com if it relates to your account." *See Warner, supra*; *see also Morrison v. Midland Funding, LLC*, No. 20-CV-6468-FPG, 2021 WL 2529618 (W.D.N.Y. June 21, 2021) (holding that Midland Funding stepped into the shoes of Synchrony entitling the Midland entities to enforce the arbitration agreement and rejecting Morrison's argument that the Midland entities could not compel arbitration because the underlying claim was based solely on the Midland entities' own alleged misconduct in collecting on the underlying debt).

Having determined that the Synchrony arbitration provision was assigned to Midland, the next step in the analysis is to determine whether Briesmeister's claim that Midland allegedly violated the AFDCPA is a claim related to her account with Synchrony. The arbitration provision, as contained in the Synchrony credit-card agreement, defines "claim" as "*any dispute or claim* between you or any other user of your account, and us, our affiliates, agents and/or Amazon.com *if it relates to your account*, except as noted below." (Emphasis added.)[4] Briesmeister does not specifically cite any persuasive case in which a court has held, under similar facts, that claims of unfair debt-collection practices do not

___

[4]We acknowledge that there are certain narrow exceptions; however, none of the exceptions are applicable herein.

18

"relate" to a credit card holder's account. While it appears that Utah has not specifically addressed whether allegations of a violation of a statutory fair-debt-collection-practices act are within the scope of an arbitration agreement that is worded like this one, other jurisdictions have specifically held that similar allegations of violations of a fair-debt-collection-practices-act scheme fall within the scope of the arbitration provision, and we find these cases persuasive. *See Church v. Midland Funding, LLC*, No. CV 20-10538, 2021 WL 2103232 (D.N.J. May 25, 2021) (holding that Church's Fair Debt Collection Practices Act (FDCPA) claim relates to defendants' collection letter and falls within the domain of the arbitration provision); *Nettles v. Midland Funding, LLC*, 530 F. Supp. 3d 706, 718 (E.D. Mich. 2021) (holding that Nettles's FDCPA claims fell within the scope of the broadly crafted arbitration clause because they were inextricably tied with the credit-card account and collection because the dispute centers on the remaining debt); *Russell v. Midland Credit Mgmt., Inc.*, No. 20-CV-00618, 2021 WL 1192580 (N.D. Ill. Mar. 30, 2021) (holding that Russell's FDCPA claim falls within the scope of the arbitration provision as it relates to her account); *Little v. Midland Credit Mgmt., Inc.*, No. 2:19-CV-5419, 2021 WL 1382257 (S.D. Ohio Feb. 24, 2021) (holding that Little's FDCPA claims fell within the substantive scope of the arbitration agreement because Midland Credit's letter to Little arose from, and was related to, the debt accrued within the account on which Midland Funding, through its agent Midland Credit, had a right to collect); *Brown v. Midland Credit Mgmt., Inc.*, No. 20-CV-4239 (JMF), 2020 WL 5117975 (S.D.N.Y. Aug. 31, 2020) (holding that Brown's FDCPA claim is not even collateral but plainly "relates" to the account because it arises from Midland Credit's efforts to collect a debt incurred in connection with the agreement);

19

*Lance v. Midland Credit Mgmt., Inc.*, No. CV 18-4933, 2019 WL 2143362, at *9 (E.D. Pa. May 16, 2019) (holding under analogous facts that Lance's FDCPA claims were within the scope of the broad arbitration agreement that included "any dispute or claim . . . if it relates to your account" with only certain exceptions that did not exclude FDCPA claims).

In *Lance*, under similar facts, Lance had obtained a credit card from Synchrony with a nearly identical credit-card agreement as in this case. *Lance, supra.* After Lance failed to make payments, Synchrony sold the account to Midland Funding, and Midland Credit serviced the account for Midland Funding. *Id.* After Midland Credit sent Lance a "collection letter," Lance filed suit in relevant part against Midland Funding and Midland Credit for violations of the FDCPA. *Id.* In determining whether Lance's claims fell within the scope of the arbitration agreement, the Pennsylvania U.S. District Court held that Lance's claims that Midland violated the FDCPA were a dispute or claim that related to his underlying Synchrony credit-card account. *Lance*, 2019 WL 2143362, at *8–9.

Here, the arbitration provision defines "claim" as "any dispute or claim between you or any other user of your account, and us, our affiliates, agents and/or Amazon.com if it relates to your account." We find the above authority persuasive and hold that Briesmeister's claim that Midland allegedly violated the AFDCPA is inextricably tied with the credit-card account and collection because Briesmeister's dispute centers on the remaining debt Midland Funding was attempting to collect under the terms of the credit-card agreement. As such, we hold that Briesmeister's claim that Midland allegedly violated the AFDCPA is a claim that relates to her account with Synchrony and falls within the scope

of the broadly crafted arbitration provision in the credit-card agreement, and the circuit court erred in finding otherwise.

V. *Appellee's Public-Policy and Waiver Arguments*

Briesmeister urges us in her responsive brief on appeal to affirm the circuit court's decision under our de novo review as a matter of public policy and because appellants had waived any right to compel arbitration after it had previously filed a separate collection suit in district court. We disagree.

> The Utah Supreme Court stated in *Nelson v. Liberty Acquisitions Servicing* that Utah
>
> "has recognized the important public policy behind enforcing arbitration agreements as an approved, practical, and inexpensive means of settling disputes and easing court congestion." *Cedar Surgery Ctr., LLC v. Bonelli*, 2004 UT 58, ¶ 14, 96 P.3d 911 (citation and internal quotation marks omitted). The supreme court has "also acknowledged that there is a strong presumption against waiver of the right to arbitrate." *Id.* (citation and internal quotation marks omitted). Consequently, a court may only infer such waiver where "the facts demonstrate that the party seeking to enforce arbitration intended to disregard its right to arbitrate." *Id.* (citation and internal quotation marks omitted).

374 P.3d 27, 29–30 (Utah 2016). Consequently, we disagree with appellee and summarily dispose of Briesmeister's argument that enforcing the arbitration provision is against public policy.

We next turn to whether appellants waived their right to arbitrate the claims that it violated the AFDCPA because it previously filed a collection suit in the district court. Briesmeister cites *Nelson*, *supra*, in support of her waiver argument. In *Nelson*, a debt collector filed suits against two consumers to collect unpaid credit-card balances. The collection suits were subsequently dismissed because the statute of limitations had expired. *Id.* The two consumers then filed a class-action lawsuit complaining that Liberty

21

Acquisitions had violated the federal Fair Debt Collection Practices Act and the Utah Consumer Sales Practices Act. *Id.* In response, Liberty Acquisitions moved to compel arbitration. The district court denied the motion to compel arbitration holding that by filing and pursuing collection actions in state court, Liberty Acquisitions waived its right to arbitrate. *Id.* In *Nelson*, the arbitration clause provided in pertinent part:

> *Any claim*, dispute, or controversy between you and us (whether based upon contract; tort, intentional or otherwise; constitution; statute; common law; or equity and whether pre-existing, present or future), *including initial claims, counterclaims, cross-claims and third party claims, arising from or relating to this Agreement* or the relationships which result from this Agreement, and except as provided below, the validity, enforceability, or scope of this arbitration provision, any part thereof or the entire Agreement ("Claim"), *shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision* and the applicable rules or procedures of the arbitration administrator selected at the time the Claim is filed.

374 P.3d at 29 (emphasis added). It is of critical importance that the Liberty Acquisition agreement did not contain any language concerning waiver or the ability of either party to have collection suits filed in district courts. This distinction was the guiding light in the subsequent case of *Reifenberger v. Autovest LLC*, No. 20-CV-571-DAK-JCB, 2021 WL 212237 (D. Utah Jan. 21, 2021), where the Utah U.S. District Court distinguished *Nelson*.

In *Reifenberger*, Reifenberger purchased a vehicle. The purchase agreement (referred to as the RICSA) contained an arbitration provision. Reifenberger became delinquent on the account, and Autovest subsequently purchased the rights to the agreement. *Id.* Autovest filed a collection suit in state court in Utah and ultimately received a default judgment against Reifenberger. *Id.* After further efforts were made by Autovest to collect on the judgment, Reifenberger filed a lawsuit in U.S. District Court alleging that Autovest did not have the requisite licensing to litigate the collection lawsuit in Utah. *Id.* Autovest moved

22

to compel arbitration on the basis of an arbitration provision contained within the sales agreement. Reifenberger opposed Autovest's motion to compel arbitration, arguing that Autovest waived its right to arbitrate by filing the prior debt-collection action in state court to collect on Reifenberger's outstanding debt. *Id.*

The *Reifenberger* court looked first at whether Autovest could compel arbitration and then whether Autovest waived the right to enforce it. The *Reifenberger* court stated the following:

> The court will address Plaintiff's second argument—whether Autovest has the right to compel arbitration under the Arbitration Agreement—first. Autovest has submitted evidence that it obtained all right, title, and interest in Reifenberger's account and that all rights under the RICSA were assigned to Autovest. The Arbitration Agreement is part of and incorporated into the RICSA. Moreover, the Arbitration agreement states that "any purchaser, assignee, or servicer" of the RICSA is covered under the Arbitration Agreement. Therefore, there is no basis for Plaintiff's argument that Autovest cannot enforce the terms of the Arbitration Agreement.

2021 WL 212237, at *4.

Having determined that Autovest had the right to compel arbitration, the court turned to whether Autovest waived that right by previously filing the collection lawsuit in state court and stated the following:

> Next, therefore, is whether Autovest waived its right to seek arbitration in this case. There is a strong federal policy "favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). Under Section 2 of the Federal Arbitration Act ("FAA"), written arbitration agreements "involving commerce" are presumed "valid, irrevocable, and enforceable." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Courts must "rigorously . . . enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018).

2021 WL 212237, at *4.

Utah law provides that waiver occurs upon a showing of words or conduct manifesting the intentional relinquishment of a known right. *Mounteer Enter., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 422 P.3d 809, 815 (Utah 2018). Hence, the *Reifenberger* court reviewed the language in the arbitration provision and the conduct of Autovest in filing the collection lawsuits to determine whether Autovest intentionally acted in a manner inconsistent with its contractual rights. *Reifenberger, supra.* The Autovest arbitration provision provided in pertinent part that "[e]ven if you and we elect to litigate a Claim in court, you or we may elect to arbitrate any other Claim, including a new Claim in that lawsuit or any other lawsuit. Nothing in that litigation waives any rights in this Agreement." 2021 WL 212237, at \*5. Therefore, the *Reifenberger* court held:

> Autovest's motion to compel arbitration in this action, despite resorting to litigation in state court for the prior debt collection action, is not acting in a manner inconsistent with its contractual rights. The claims at issue in this case were not at issue in the state debt collection action. And, most importantly, Autovest's request to compel arbitration in this subsequent lawsuit is expressly allowed in the parties' agreement.

2021 WL 212237, at \*5.

The *Reifenberger* court then distinguished *Nelson* by stating Reifenberger's reliance on *Nelson*

> is misplaced because it is factually distinguishable. *Nelson* did not involve an agreement with a specific waiver provision like the one in this case, and nothing in the *Nelson* decision would displace the specific terms of an arbitration agreement like the one the parties entered into in this case. . . . Unlike *Nelson*, the Arbitration Agreement in this case permitted either party to file suit without waiving their arbitration rights on separate claims. Autovest's collection claims in state court were separate and distinct from the claims Plaintiff raises in this case. Therefore, there is no basis for finding that Autovest waived its right to seek arbitration on Plaintiff's claims. Accordingly, the court grants Autovest's Motion to Compel Arbitration.

2021 WL 212237, at \*5.

24

*Reifenberger* was recently cited with approval in *Morrison v. Midland Funding, LLC*, No. 20-CV-6468-FPG, 2021 WL 2529618 (W.D.N.Y. June 21, 2021). In *Morrison*, with facts very similar to the case at bar, the court stated the following:

> Plaintiff analogizes this matter to cases in which courts have determined a party waived its right to arbitrate because of prior litigation. *See* ECF No. 24 at 16-17. Specifically, Plaintiff cites *Nelson v. Liberty Acquisitions Servicing LLC*, 374 P.3d 27 (Utah Ct. App. 2016). There, a debt collector's underlying suit for collection was dismissed on statute of limitations grounds. *Nelson*, 374 P.3d at 28. Subsequently, plaintiffs filed a class action alleging a violation of the FDCPA for filing time-barred debt collection lawsuits. *Id.* The court denied defendants motion to compel holding that defendants waived their right to arbitration by filing the underlying debt collection action in court. *Id.* at 32. However, the court in *Reifenberger v. Autovest LLC*, No. 20-CV-571-DAK-JCB, 2021 WL 212237 (D. Utah Jan. 21, 2021), distinguished Nelson on the grounds that the underlying contract before it specifically stated "[e]ven if you and we elect to litigate a Claim in court, you or we may elect to arbitrate any other Claim, including a new Claim in that lawsuit or any other lawsuit." *Id.* at ★5. Because the agreement expressly permitted parties to file suit without waiving the right to compel arbitration on subsequent claims, the court in Reifenberger compelled arbitration on the plaintiffs' improper collection process claim. *Id.*

*Morrison*, 2021 WL 2529618, at ★4.

Here, we believe the opinions in *Reifenberger* and *Morrison* are persuasive. The Synchrony agreement in the case at bar states, "Waiver. We may give up some rights under this Agreement. If we give up any of our rights in one situation, we do not give up the same right in another situation." And the Synchrony arbitration clause in particular provides the following exclusion: "We will not require you to arbitrate: (1) any individual case in small claims court or your state's equivalent court, so long as it remains an individual case in that court; or (2) a case we file to collect money you owe us." As in *Reifenberger* and *Morrison*, Midland's filing a previous collection lawsuit in district court herein does not violate any contractual rights of the parties as set forth in the agreements; therefore, the prior

25

collection action filed by Midland Funding in the district court did not act as a waiver of the arbitration provision.

VI. *Motion to Strike Class Action Allegations*

Appellants below pled and argued that the class action waiver in the arbitration provision should be enforced as written because it is clear and unambiguous and not contrary to public policy. The circuit court ruled to the contrary finding that "there is no binding agreement barring class action status between the parties to this suit regarding Defendants alleged violations of the AFDCPA." In appellants' notice of appeal, appellants state that they are appealing from the order denying defendants' motion to compel arbitration *and* strike class allegations and all findings related thereto.

Arkansas Rule of Appellate Procedure–Civil 2(a) provides for this court's jurisdiction over interlocutory appeals only in specific circumstances. The denial of a motion to strike class allegations is not one of those circumstances; nor does appellant cite any provision other than subsection (a)(12) of Rule 2. This appeal is permitted on an interlocutory basis only to address issues related to the denial of a motion to compel arbitration pursuant to Arkansas Rule of Appellate Procedure–Civil 2(a)(12). Therefore, to the extent appellants are making any arguments regarding the circuit court's denial of their motion to strike class allegations, they do not fall within the purview of this type of interlocutory appeal and are beyond the scope of this limited appeal. *See generally Asset Acceptance, LLC v. Newby*, 2014 Ark. 280, 437 S.W.3d 119. As such, we only address issues related to the denial of a motion to compel arbitration in this opinion.

26

## VII.  *Conclusion*

In conclusion, for the reasons stated herein, the circuit court erred in denying appellants' motion to compel arbitration.  Therefore, we reverse and remand.

Reversed and remanded.

HARRISON, C.J., and KLAPPENBACH, J., agree.

*Quattlebaum, Grooms & Tull PLLC*, by: *Michael N. Shannon* and *Sarah Keith-Bolden*, for appellants.

*Corey D. McGaha PLLC*, by: *Corey D. McGaha*; and *Edelman, Combs, Latturner & Goodwin LLC*, by: *Daniel A. Edelman*, pro hac vice; and *Cathleen Combs*, pro hac vice, for appellee.